# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-BR-00587-SCT

*M. REID STANFORD*

*v.*

*THE MISSISSIPPI BAR*

| | |
|---|---|
| ATTORNEYS FOR APPELLANT: | ANDREW J. KILPATRICK, JR. |
| | B. SEAN AKINS |
| ATTORNEY FOR APPELLEE: | MELISSA SELMAN MARTIN |
| NATURE OF THE CASE: | CIVIL - BAR MATTERS |
| DISPOSITION: | REINSTATEMENT DENIED - 01/17/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1. Attorney M. Reid Stanford filed the instant petition for reinstatement pursuant to Rule 12 of the Rules of Discipline for the Mississippi State Bar following his suspension from the practice of law. While the Mississippi Bar supports Stanford's petition for reinstatement, its support is conditioned upon the Court's determination of whether "restitution by a third party, such as an insurance company, satisfies the ***Benson*** requirement that an attorney petitioning for reinstatement must make full amends/restitution[.]"[1] Because Stanford's

---

[1] ***In re Benson***, 890 So. 2d 888, 890 (Miss. 2004).

petition fails to satisfy the jurisdictional requirements necessary for reinstatement, we deny

his petition for reinstatement.

## FACTS AND PROCEDURAL HISTORY

¶2. In September 2017, the Complaint Tribunal of the Supreme Court of Mississippi entered an agreed opinion and judgment in the case of *Mississippi Bar v. M. Reid Stanford*, No. 2011-B01390 (Miss. 2011), wherein M. Reid Stanford received a "three year suspension to be composed of a six month suspension with two and half years of probation[.]" According to the opinion, the basis for Stanford's suspension was as follows:

> Mr. Stanford owned a 40% interest in MREC, Inc., a real estate closing company. MREC, Inc. held a 40% interest in Mississippi Real Estate Closings of Hattiesburg, LLC . . . . MREC, Inc. also held a 40% interest in Mississippi Real Estate Closings of Columbus, LLC; Mississippi Real Estate Closings of Greenwood, LLC; Mississippi Real Estate Closings of Grenada, LLC; Mississippi Real Estate Closings of Hernando, LLC; Mississippi Real Estate Closings of Oxford, LLC; Mississippi Real Estate Closings of Senatobia, LLC; Mississippi Real Estate Closings of Southaven, LLC and Mississippi Real Estate Closings of Tupelo, LLC.
>
> With the approval of Stewart Title Guaranty Company . . . , Mr. Stanford elected to use a sweep account for all of the real estate closing businesses' escrow accounts. All of the available funds in each escrow account were "swept" from the accounts daily following the close of business and placed into an investment account. When a check payable on any individual account was presented for payment[,] funds sufficient to pay the check were "swept" back into the account without regard as to which loan closing company had deposited the funds.
>
> On March 6, 2009, Grand Bank for Savings, FSB ("Grand Bank") entered into a transaction with SP Properties and Russell Roberts ("Roberts") to purchase certain property in Lamar County, Mississippi. During the transaction, a dispute arose over the availability of parking. Roberts and Grand Bank contacted Mr. Stanford and asked if $100,000.00 of the loan proceeds could remain in the escrow account of [Mississippi Real Estate Closings of Hattiesburg, LLC]. The settlement statement for the transaction between

Grand Bank and the Roberts reflects the $100,000.00 from the sale proceeds to be held in escrow by [Mississippi Real Estate Closings of Hattiesburg, LLC,] related to the parking issue. When Grand Bank and Roberts failed to resolve the parking issue, [Mississippi Real Estate Closings of Hattiesburg, LLC,] attempted to interplead the escrowed funds on April 29, 2009; however the escrowed funds were not available to deposit with the Chancery Court.

Between March 6, 2009, when the $100,000.00 from the Grand Bank transaction was deposited[,] and April 29, 2009, when [Mississippi Real Estate Closings of Hattiesburg, LLC,] attempted to interplead the funds, an employee at [Mississippi Real Estate Closings of Tupelo, LLC,] failed to make a deposit of approximately $587,000.00[,] making the [Mississippi Real Estate Closings of Tupelo, LLC,] account deficient to cover the checks and wires from the closing. When checks and wires for the Tupelo closing were presented for payment, the [Mississippi Real Estate Closings of Tupelo, LLC,] account had insufficient funds to pay the proceeds from the closing. As a result, the sweep account automatically used money from the other real estate closing businesses' accounts to cover the Tupelo error, again without regard as to which company had deposited the funds. This necessarily included the $100,000.00 held in escrow by [Mississippi Real Estate Closings of Hattiesburg, LLC,] for Grand Bank and Roberts.

Upon learning of the problem, Mr. Stanford closed the sweep account, but at that point, neither Mr. Stanford nor anyone else was able to determine what portion of the remaining funds belonged to which real estate closing business or any party to any real estate transactions being conducted by those businesses. Eventually, $80,000 was found in the account of Mississippi Real Estate Closings of Southaven, LLC, but the distribution of the full $100,000[.00] has still not been accounted for to date.

Based on Stanford's conduct, the Complaint Tribunal concluded that he violated Mississippi Rules of Professional Conduct 1.15(a), 1.15(b), 5.3, and 8.4. In determining the appropriate discipline, the Complaint Tribunal noted that "the Supreme Court of Mississippi has not extended leniency to attorneys who mishandle the funds of others. The Court has repeatedly disbarred lawyers for as little as one instance of misappropriation." The Complaint Tribunal found that Stanford "should be suspended for three years to be comprised of a six month

3

suspension and two and a half years of probation effective as and from September 1, 2017."

Additionally, Stanford had to pay costs and expenses incurred by the Bar, notify all clients with active matters, parties opposite, and courts and agencies with active cases of his of his suspension. Finally, the suspension prohibited Stanford from the practice of law or holding himself out as a lawyer until he sought and was granted reinstatement from the Court. Stanford agreed to the discipline imposed by the Complaint Tribunal.

¶3. In April 2018, Stanford filed a petition for reinstatement with the Court. In his petition, he explained the underlying conduct for which he was disciplined. He also represented that he had complied with the requirements imposed upon him by the agreed order. Stanford submitted twelve letters of recommendation in support of his reinstatement. The Mississippi Bar conducted an investigation into Stanford's petition for reinstatement and concluded that it supported Stanford's reinstatement, conditioned upon the Court answering one question, whether "restitution by a third party, such as an insurance company, satisfies the **Benson** requirement that an attorney petitioning for reinstatement must make full amends/restitution," in the affirmative.

## ANALYSIS

¶4. In matters "pertaining to attorney discipline, reinstatement, and appointment of receivers for suspended and disbarred attorneys[,]" the Court has exclusive and inherent jurisdiction. *In re Reinstatement of Watkins*, 849 So. 2d 843, 845 (¶ 8) (Miss. 2002). Reinstatement to the practice of law is governed by Rule 12 of the Rules of Discipline for the Mississippi State Bar, and Rule 12(a) provides that "no person . . . suspended for a period

of six months or longer shall be reinstated to the privilege of practicing law except upon petition to the Court." The Court applies a de novo standard when reviewing attorney reinstatement petitions. *Watkins*, 849 So. 2d at 845 (¶ 8).

¶5. The Court has provided the following jurisdictional requirements that a petitioner for reinstatement must satisfy:

> (1) state the cause or causes for suspension or disbarment; (2) give the name and current address of all persons, parties, firms, or legal entities who suffered pecuniary loss due to the improper conduct; (3) make full amends and restitution, (4) show that he has the necessary moral character for the practice of law; and (5) demonstrate the requisite legal education to be reinstated to the privilege of practicing law. Though not a jurisdictional requirement, we consider the Bar's position as to reinstatement as a factor in determining whether to grant the petition.

*In re Benson*, 890 So. 2d at 890 (¶6).

### CAUSE FOR SUSPENSION

¶6. In his petition for reinstatement and at the deposition regarding his petition for reinstatement, Stanford provided an account of the underlying actions that resulted in his suspension. We agree with the Bar's position that Stanford satisfied the first jurisdictional requirement.

### NAMES AND ADDRESSES OF THOSE WHO SUFFERED PECUNIARY LOSS

¶7. As to the second jurisdictional requirement, Stanford was to present the names and current addresses of all persons, parties, firms, or legal entities who suffered pecuniary loss due to the improper conduct. The Bar states that "Stanford's Petition and his testimony at

5

deposition adequately acknowledge the pecuniary loss incurred as a result of his misconduct

. . . ."

¶8.    While Stanford does acknowledge the names of the parties to the transaction who lost

access to their funds. Nowhere in his petition or any provided documents does he include the

addresses of the parties.   The Court has repeatedly held that the burden lies with the

petitioner to prove rehabilitation and to prove that he has met the jurisdictional requirements

necessary to be reinstated.   ***Benson***, 890 So. 2d at 890 (¶¶ 4-5).   The jurisdictional

requirement requires the addresses of parties who suffered pecuniary loss, and Stanford has

not fully satisfied the jurisdictional requirement.

### FULL AMENDS AND RESTITUTION

¶9.    Next, Stanford was required to prove that he has made full amends and restitution to

the parties who suffered pecuniary loss due to his misconduct.   The Bar explains,

> In the course of its investigation, the Bar received a letter from Gene Harlow
> . . . .   Mr. Harlow asserts that his client was not made completely whole in the
> settlement with Mr. Stanford's insurance carrier.   Mr. Harlow's clients were
> deprived the use of $100,000.00 and ultimately received only $75,000.00 from
> Mr. Stanford's insurance carrier.   The parties also executed a full release as
> part of the settlement. . . .   This letter [from Harlow] prompted further
> investigation from the Office of General Counsel.   Mr. Stanford fully
> cooperated with the additional investigation and provided more information.
> The Roberts[es] made a settlement offer of $75,000.00 to Mr. Stanford's
> insurance carrier, that the carrier accepted.   Mr. Stanford's policy limits were
> more than sufficient to cover the full amount of loss.   The Roberts[es] entered
> into an agreement to accept $75,000.00 and executed the appropriate releases
> to fully and finally settle their claim.
>
> There appears to be a question of first impression in the context of attorney
> reinstatement for [the] Court to decide.   Does payment by a third person, such
> as an insurance company, on behalf of a petitioner fulfill[] the making full
> amends/restitution requirement for reinstatement.   In this case[,] the parties did

6

not receive the full amount of loss but executed releases fully and finally settling the matter.

In a footnote, the Bar stated, "Additionally, Mr. Stanford filed and received a discharge in bankruptcy and any attempt to further collect debt through the disciplinary process may be impermissible under 11 U.S.C. § 524."

¶10. Harlow's letter, which is an exhibit attached to the Bar's answer, stated, "And to be clear, to this very date, these funds have not been fully replaced or repaid. . . . We feel that the full responsibility lay with Mr. Stanford[,] and he has an obligation to make the parties affected by his actions whole before he seeks reinstatement." Harlow further explained that "[t]here was in reality a $75,000.00 settlement after much litigation and significant expense that was paid by [Stanford's] insurance carrier." Harlow concludes,

> The point to be made is that he did not take responsibility for his actions. If my client [was] to be made whole, I would assume that the amount my clients received would be the full $100,000.00 plus the costs of litigation concerning the missing funds. This type of restitution has never occurred.

Stanford's response to the letter reiterated that insurance coverage was available for well over the $100,000 plus litigation expenses actually lost by the Robertses but that Harlow's letter did not explain why the case was settled for $75,000. According to Stanford, "it was Mr. Harlow and his clients that made the conscious decision to accept the money in a full and complete settlement of all claims. This was not forced on them by anyone and certainly not Mr. Stanford who would have had little to no control over the carrier's decision to settle the case."

¶11. The Court has explained that "[t]o make restitution is '1. [a]n act of restoring the proper owner of something taken away, lost, or surrendered. 2. [a]n act of repaying or compensating for loss, damage, or injury. 3. [a] return to or restoration of a former state or position'." *In re Prisock*, 5 So. 3d 319, 323 (¶ 27) (Miss. 2008) (citation omitted). Although not a lot of caselaw exists on the specific issue, the Court appears to have taken a hardline approach to restitution.

¶12. In *Watkins*, 849 So. 2d at 844 (¶ 1), disbarred attorney William Watkins sought reinstatement to the practice of law. After Watkins pleaded guilty to three counts of "financial institution fraud and making false statements to influence the actions of a federally insured financial institution[,]" he was ordered to pay restitution to two different Louisiana banks. *Id.* at 844 (¶ 2). At the time he petitioned for reinstatement, a "point of contention between Watkins and the Bar" existed about whether he had paid Pelican Homestead Bank its full amount of restitution. *Id.* The Court explained,

> Pelican Homestead extended a line of credit in the amount of $135,000.00 to Watkins in 1983, and this line of credit is the main portion of the financial dealings that led to Watkins's criminal indictment and disbarment. Following his conviction, Watkins was ordered to pay restitution to Pelican Homestead in the amount of $107,335.00. However, he only paid Pelican Homestead $10,000.00 before the Bank became insolvent and was taken over by the Federal Deposit Insurance Corporation (FDIC).

*Id.* at 844 (¶ 3). Moreover,

> Watkins and the FDIC entered into an agreed compromise and settlement reducing Watkins's obligation to Pelican Homestead to $35,000.00. On July 12, 1999, the United States District Court for the Eastern District of Louisiana entered an Amended Judgment and Commitment Order amending that court's June 13, 1991, order to read "the defendant is to make restitution to the Federal Deposit Insurance Corporation to be paid in a single lump sum payment of

8

$35,000.00 in the form of a cashier's check payable to the United States Department of Justice, within 45 days following entry of this order, or on August 23 1999, whichever date is later." . . . The main issues in this case are whether the settlement agreement reached with the FDIC constitutes full restitution to a person or entity that was harmed by Watkins's wrongful conduct, and whether he still must pay the $97,335.00 (now $62,335.00) to Pelican Homestead.

*Id.* at 844-45 (¶ 4). In denying Watkins's petition for reinstatement, the Court held,

Petitioners for reinstatement to the Bar have the burden of proving that they have met all the jurisdictional requirements of Rule 12.7. The cursory order entered by the U.S. District Court in the Eastern District of Louisiana, by itself, does not satisfy this burden. Since the petitioner did not include any financial evidence that the $35,000.00 amount reached as settlement with the FDIC was equal to the financial liability incurred by Pelican Homestead, his burden has not been met. The petition does not include any evidence of the amount that Pelican Homestead realized off the oil and gas production, nor does it show any other reason Watkins was not liable for less than the $107,335.00. Watkins contends in his deposition taken by the Mississippi Bar that this amount reflects the financial loss incurred by the lending institution in his fraudulent dealings with them. However, the petitioner in reinstatement cases has a heavier burden than simple assertions. Watkins must submit proof of this assertion. Watkins claims that he never received credit for the amount realized by the bank on the oil and gas production fields that the bank received which Watkins defaulted on the loan. However, he offered no proof of this claim. Until Watkins can present evidence that the amount agreed upon with the FDIC represents the financial loss that Pelican Homestead actually suffered, his burden has not been met.

*Id.* at 847 (¶ 15). As in *Watkins*, it is clear from the face of the petition that the party has not been made whole by the settlement. Additionally, there is an important distinction between a party's legal liability that can be cured by a settlement and a party's duty to provide full restitution as a requirement for reinstatement. Plaintiffs and creditors often accept settlements that equal less than the actual debt, and they do so for varied reasons, *e.g.*, to avoid litigation expenses and to avoid a full or nearly-full loss of the amount in the event

9

of an adverse verdict or bankruptcy.  The execution of a release by the injured party does not release Stanford from the full restitution duty imposed by the reinstatement process.  As stated previously, it is the duty of the petitioner to satisfy each requirement, and based on the petition currently before the Court, Stanford did not satisfy the requirement.

## NECESSARY MORAL CHARACTER FOR LAW PRACTICE

¶13.   The fourth requirement is that Stanford prove that he has the necessary moral character to practice law.  The Bar's answer to Stanford's petition, took into consideration Stanford's employment since his suspension, any civic and charitable involvement Stanford engaged in while suspended, personal letters of recommendation or opposition to Stanford's reinstatement, and Stanford's mental and emotional state.

¶14.   During his deposition, Stanford testified that he had not engaged in the practice of law since his suspension, and he outlined measures he took to ensure that he was not perceived as practicing law.  Stanford explained that during his suspension, he compiled data in environmental cases for expert witnesses to use, and he summarized depositions.  Stanford indicated that he enjoyed the environmental cases he had been working on during his suspension and said that he planned to continue working in that area should he be reinstated.

¶15.   As the Bar points out in its answer, the length of Stanford's suspension "does not lend itself to the type of active community involvement we usually see from a petition[,]" which was limited further by Stanford's moving several times during his suspension.  Stanford did testify that he has found a new church in the Pope community, where he hopes to become more active.

¶16. Stanford submitted twelve letters of recommendation in support of his petition, and the Bar received one letter of opposition from the attorney who represented the injured parties, which was discussed in detail above. The Bar stated that "Stanford appears to be mentally and emotionally stable during his deposition and testified that he is not suffering from any serious medical problems; that he does not use illegal drugs; and that he is generally in good health."

¶17. The Bar concluded that Stanford, through his petition and testimony, has demonstrated that he has the requisite moral character and mental health to practice law.

### DEMONSTRATE REQUISITE LEGAL EDUCATION

¶18. Finally, Stanford must demonstrate that he has the requisite legal education to be reinstated. In support of his petition, Stanford testified that during his suspension, he studied for, took, and satisfactorily passed the Multistate Professional Responsibility Exam. Stanford testified that at the time of his suspension, he had been current on his Continuing Legal Education hours.

### THE BAR'S RECOMMENDATION

¶19. As discussed above, the Bar does support Stanford's petition for reinstatement, conditional upon the Court's decision about whether Stanford satisfied the requirement to make full amends and restitution.

### CONCLUSION

¶20. Because Stanford failed to satisfy each jurisdictional requirement for reinstatement to the practice of law, we deny Stanford's petition for reinstatement to the practice of law.

¶21. **PETITION OF M. REID STANFORD FOR REINSTATEMENT TO THE PRACTICE OF LAW IN THE STATE OF MISSISSIPPI IS DENIED.**

**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR.**